# Richmond.

## Knights of the Ku Klux Klan v. Commonwealth, Ex Rel. State Corporation Commission.

### March 20, 1924.

1. FOREIGN CORPORATIONS—*Doing Business within the State—Compliance with Sections 3847 and 3848 of the Code of 1919.*—The Constitution of Virginia (Const. 1902, sec. 163) precludes foreign corporations from exercising their functions in this State, except upon compliance with the laws of the State, and expressly authorizes the General Assembly to discriminate against foreign corporations if it is deemed expedient; and there is no doubt that the General Assembly may exclude foreign corporations from exercising their corporate functions within this State, subject only to the inhibitions of the Federal Constitution.

2. FOREIGN CORPORATIONS—*Doing Business within the State—Compliance with Sections 3847 and 3848 of the Code of 1919—Ku Klux Klan—Case at Bar.*—The Knights of the Ku Klux Klan, a corporation chartered under the laws of the State of Georgia, is required to comply with sections 3847 and 3848 of the Code of 1919 applicable to foreign corporations desiring to do business or exercise their corporate functions in this State; and the Knights of the Ku Klux Klan is subject to fine under section 3848 for failure to comply with the provisions of the Code of 1919, section 3847.

3. FOREIGN CORPORATIONS—*Doing Business within the State—Compliance with Sections 3847 and 3848 of the Code of 1919—Ku Klux Klan—Case at Bar.*—The Knights of the Ku Klux Klan is a foreign corporation incorporated under the laws of Georgia, without capital stock. Its purposes are stated to be patriotic, secret, social, and benevolent. Solicitors for the corporation have succeeded in establishing in this State a number of local organizations, charging an initiation fee of $10.00, $8.00 of which is divided among the officers of the Klan, and $2.00 of which goes to the treasury of the national organization. No part of the fee goes into the treasury of the local Klan. Members were required to equip themselves with paraphernalia, for which a charge of $6.50 each was made. According to the evidence, upon at least one occasion, new members upon their initiation were furnished with the paraphernalia, which was already on hand in this State and sold and delivered to them.

*Held:* That the corporation was exercising its functions and powers within the State, and subject to the provisions of sections 3847 and 3848 of the Code of 1919.

4. Foreign Corporations—*Doing Business within the State—Commercial Business—Sections 3847 and 3848 of the Code of 1919.*—Doing business, as used in sections 3847 and 3848 of the Code of 1919, with reference to foreign corporations, is not confined to commercial or manufacturing functions only. But the exercise of its corporate functions by any foreign corporation within this State constitutes transacting business here within the meaning of these sections.

5. Foreign Corporations—*Interstate Commerce—Doing Business within the State—Ku Klux Klan.*—The acts of the Knights of the Ku Klux Klan under its charter in soliciting members, organizing lodges, distributing its regalia, collecting its fees, and making such contracts as were involved in or incidental to these acts, were done within the State of Virginia under the protection of its laws, and their indirect connection with anything which could be fairly held to be interstate commerce is too remote to relieve it from the provisions of sections 3847 and 3848 of the Code of 1919.

6. Foreign Corporations—*Beneficial and Benevolent Associations—Knights of the Ku Klux Klan.*—As the Knights of the Ku Klux Klan is not a fraternal beneficiary association and does no insurance business, chapter 171 of the Code of 1919, referring to "fraternal beneficiary associations, orders or societies," has no application to it.

7. Foreign Corporations—*Sections 3847 and 3848 of the Code of 1919—Fraternal Organizations.*—Sections 3847 and 3848 of the Code of 1919 relating to foreign corporations doing business within the State do not affect unincorporated voluntary fraternal organizations.

8. Foreign Corporations—*Knights of the Ku Klux Klan—Doing Business within the State—Exercise of Corporate Functions.*—Where the Knights of the Ku Klux Klan, through its paid agents, were engaged in the State of Virginia in promoting and carrying out its primary corporate purposes by the establishment of subordinate lodges and by the institution therein of its ritualistic forms and ceremonies, this constituted doing business within the meaning of that phrase as used in sections 3847 and 3848 of the Code of 1919.

Error to a judgment of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*R. K. Spiller, D. H. and Walter Leake,* and *Scott & Buchanan,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General, Leon M. Bazile, Second Assistant Attorney-General,* and *J. Randolph Tucker,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

Whether or not the Knights of the Ku Klux Klan, a corporation chartered under the laws of the State of Georgia, is required to comply with the statutes applicable to foreign corporations desiring to do business or exercise their corporate functions in this State, is the question here involved. The corporation has been fined under Code, section 3848, for failure to comply with the provisions of Code, section 3847, both of which are printed in the margin.* In this connection it is proper also to consider this pertinent part of section 163 of the Constitution, also in the margin.†

---

*Section 3847. *Every company to keep an office in this State for payment of claims to residents; foreign company to appoint agent on whom process may be served; copy of charter, with power of attorney, to be filed, etc.; license; fees.—* Every incorporated company doing business in this State shall have an office in the State, at which all claims against the company due residents of the State may be audited, settled and paid. Every such company incorporated under a jurisdiction beyond the limits of this State (and hereinafter designated as a foreign corporation) shall, before doing business in this State, present to the State Corporation Commission (a) a written power of attorney, executed in duplicate, appointing the Secretary of the Commonwealth of this State and his successor in office its agent, upon whom all lawful process shall be served, and who shall be authorized to enter an appearance in its behalf; (b) two duly authenticated copies of the charter of the corporation; and (c) a certificate of the Auditor of Public Accounts, showing the payment into the treasury of the fee required by law to be paid by such corporation, and shall obtain from said State Corporation Commission a certificate of authority to transact business in the State. If it shall be made to appear to the State Corporation Commission that said corporation has complied with the law relative to the obtaining of a certificate of authority for foreign corporations of the character of the applicant corporation, then said State Corporation Commission shall isssue to said corporation a certificate of authority to transact business in the State.

† See footnote, page 505.

Section 3848-a makes it unlawful for a foreign corpo-ration to "transact any business in this State" or to offer or advertise to do so, without first complying with these statutes.

[1-4] It seems to us that the mere recital of the fact that the appellant is a Georgia corporation is sufficient to sustain the conclusion of the Commission, for the language of the inhibiting statutes seems too plain to require any interpretation. The Constitution pre-cludes foreign corporations from exercising their func-tions in this State, except upon compliance with the laws of the State, and expressly authorizes the General Assembly to discriminate against foreign corporations if it is deemed expedient. That the General Assembly may exclude foreign corporations from exercising their corporate functions within this State, subject only to

Said Commission shall file and preserve in their office one copy each of the power of attorney, charter, certificate of the Auditor and a certificate of the Commission granting such certificate of authority, and forward copies of said documents to the Secretary of the Commonwealth, who shall file and preserve the same in his office.

If the charter of any foreign corporation thus authorized to transact busi-ness in this State is amended, two duly authenticated copies of such amend-ment shall be presented to the State Corporation Commission and filed as copies of the original charter are required to be filed, and the fee required by law on such amendment shall be paid in the manner prescribed by law. Any foreign corporation which has heretofore paid the fee required by law to entitle it to transact business in this State, and has otherwise complied with the law heretofore existing relative thereto, shall not, on application for certificate of authority to transact business in this State, be required to pay such fee again, nor to file a copy of the charter with the Secretary of the Commonwealth, if a copy thereof is already on file in his office. Such corporation shall pay the clerical fees for such certificate of authority and for filing such papers as prescribed by law.

Section 3848. *License; penalty for doing business without; agents personally liable; surrendering license; construction as to public service corporations.—* If any foreign corporation shall transact business in this State without first obtaining such certificate of authority provided for in the preceding section, it shall be fined not less than $10.00 nor more than $1,000.00, such fine to be

the inhibitions of the Federal Constitution, is every-where conceded. It is claimed here, however, by the appellant, that the State has neither exercised this undoubted power nor imposed any conditions or restrictions upon corporations of this class, and the supporting argument is chiefly based upon the contention that the words "doing business" cannot be applied to a corporation which claims to be organized for patriotic and benevolent purposes.

It is agreed that this appeal shall be determined by a consideration of the charter and the facts which are thus recited:

"The Knights of the Ku Klux Klan is a foreign corporation incorporated under the laws of the State of Georgia, without capital stock. Its purposes are stated to be patriotic, secret, social and benevolent. It

imposed by the State Corporation Commission, whose duty it shall be to see that provisions of the preceding section are complied with. Every transaction had in the State by such a corporation without such certificate of authority shall be deemed a separate offense. The officers, agents and employees of any such corporation doing business in this State without such certificate of authority shall be personally liable to the State for any fines imposed on it, and to any resident of the State having a claim against such corporation, and service of legal process upon any of said officers, agents or employees within this State shall be deemed sufficient service on the corporation.

No such foreign corporation shall recover any money or property or enforce any contract in any court without first obtaining the certificate of authority to do business in this State provided for in the preceding section, nor until all taxes, fees and charges due to the State have been fully paid; but, nothing contained in this section shall prevent any corporation, after having withdrawn from the State, from enforcing a contract legally made while said company was acting under a certificate of authority from the State Corporation Commission as provided in this chapter.

When any such corporation shall desire to cease doing business in this State, it may do so by surrendering to the State Corporation Commission such original certificate of authority, or, if it be lost or destroyed, by filing an affidavit to that effect with the State Corporation Commission in lieu of such original certificate of authority, and by paying all taxes, fees and

is apparently well organized to secure new members and establish local Klans. Operations were begun in Virginia about September, 1920, and solicitors have succeeded in establishing possibly fifty-four local organizations within this State, charging an admission or initiation fee of $10.00 to each individual member admitted. No part of this sum, it is stated, goes into the treasury of a local Klan, but $4.00 is paid to the King Kleagle or State organizer; fifty cents to the Grand Goblin or organizer in charge of several States; $2.50 to the Imperial Kleagle at the head of propagation and organization work, and the remaining $2.00 to the treasury of the national organization in Atlanta.

"Members received into the order were required to equip themselves with paraphernalia, including a robe and hood furnished from the office of the Imperial Wizard in Atlanta, for which a charge was made in the sum of $6.50 each. Order blanks provided that the robe and hood remain the property of the Knights of the Ku Klux Klan and upon surrender the money was to be returned.

---

charges then due to the State. Such certificate of authority shall not be construed to authorize any such foreign corporation to exercise any of the powers or functions of a public service corporation in this State, nor to exempt such foreign corporation from the payment of any State or local revenue license.

†Section 163. *As to foreign corporations.*—No foreign corporation shall be authorized to carry on, in this State, the business, or to exercise any of the powers or functions, of a public service corporation, or be permitted to do anything which domestic corporations are prohibited from doing, or be relieved from compliance with any of the requirements made of similar domestic corporations by the Constitution and laws of this State, where the same can be made applicable to such foreign corporation without discriminating against it. * * The property, within this State, of foreign corporations shall always be subject to attachment, the same as that of non-resident individuals; and nothing in this section shall restrict the power of the General Assembly to discriminate against foreign corporations whenever, and in whatsoever respect, it may deem wise or expedient.

"Upon at least one occasion, according to the evidence, robes and hoods were furnished to new members upon their initiation at the organization of a local Klan, said articles being already on hand in this State and sold and delivered at the time.

"The defendant exhibited a measurement blank on which orders for robes were to be sent to Atlanta and there filed by the Atlanta organization. The witness also testified that this was the usual way of ordering or procuring robes for any Klan."

And the petition recites that:

"The charter of the corporation provides, *inter alia*, that 'the purpose and object of said corporation is to be purely benevolent and eleemosynary, and there shall be no capital stock or profit or gain to the members thereof.' "

And in paragraph 4 is the following provision: "The petitioners desire that the society shall have the power to confer an initiation degree ritualism, fraternal and secret obligations, words, grip, signs and ceremonies under which there shall be united only white male persons of sound health, good morals and high character, and further desire such rights, powers and privileges as are now extended to the Independent Order of Odd Fellows, Free and Accepted Order of Masons, Knights of Pythias, *et al.*, under and by virtue of the laws of the State of Georgia.

"Accordingly, the society was incorporated and chartered under the laws of Georgia as 'a purely benevolent and eleemosynary society, having no capital stock, for the purpose of conducting a patriotic, secret, social, benevolent order.'

"The society carries no insurance feature whatever and it is perfectly apparent from the foregoing facts that the corporation is precisely what it is declared to be by its charter."

When the charter was obtained the incorporators did not hesitate to use the word "business" as defining its objects, purposes and powers, for section 7 reads thus:

"Petitioners desire that the business of the society shall be under the control of the 'Imperial Wizard' (president), who shall be amenable in his official administration to the 'Imperial Kloncilium' (supreme executive committee), a majority of whom shall have authority to act, and a two-thirds majority power to veto the official acts of the 'Imperial Wizard' (president) in the matters pertaining to the general welfare of the society, and to contract with other members of the society for the purpose of promoting and conducting its interests and general welfare, in any way, manner, or method he may deem proper for the society's progress and stability, subject to the restrictions of the power of the 'Imperial Wizard' (president) as is heretofore set forth in this paragraph."

And section 9 reads thus:

"Petitioners desire the right to own separate unto itself and to control the sale of all paraphernalia, regalia, stationery, jewelry and such other materials needed by the subordinate branches of the order for the proper conduct of their business; the right to publish a fraternal magazine and such other literature as is needed in the conduct of the business of the order; the right to buy, hold and sell real estate and personal property suitable to the purpose of the said corporation; to sell, exchange or sublease the same or any part thereof; to mortgage or create liens thereon; to borrow money and secure the payment thereof by mortgage or deed of trust and to appoint trustees in connection therewith; to execute promissory notes, to have and use a common seal; to sue and be sued; to plead and be impleaded; to do and perform all those things and exercise all those

rights, which under the laws of Georgia are conferred upon societies or orders of like character."

From these conceded facts it is perfectly apparent that the corporation is exercising its functions and powers within this State. The claim is, however, that the words "doing business" have reference to the exercise of some commercial, manufacturing, or other function, and that the State has only intended to exclude corporations of this character. We find nothing in the Virginia statutes to justify such a limitation upon the language used.

*Jones* v. *Rhea*, 130 Va. 345, 107 S. E. 814, is cited and relied on by the appellant. We cannot agree, however, that this case can be construed to affect the question here involved, because the issue there involved was whether two nonstock domestic corporations (social clubs) could merge under other statues of Virginia. The construction of those statutes does not aid in the construction of the particular statutes here under review.

[5] The only other question raised which calls for any notice is the claim that the exaction of the fee imposes a burden upon interstate commerce.

We will not elaborate our conclusion that this contention is without merit. The acts of this corporation under its charter in the soliciting of members, organizing lodges, distributing its regalia, collecting its fees and making such contracts, express or implied, as were involved in or incidental to all of these acts, were done within the State of Virginia under the protection of its laws, and their indirect connection with anything which can be fairly held to be interstate commerce is too remote for further consideration.

These sections were attacked and have been upheld in *Dalton Adding Machine Co.* v. *Commonwealth of Virginia*, 246 U. S. 498, 38 Sup. Ct. 361, 62 L. Ed. 851,

affirming 118 Va. 563, 88 S. E. 167, and in *General Railway Signal Co.* v. *Commonwealth of Virginia*, 246 U. S. 500, 38 Sup. Ct. 360, 62 L. Ed. 854, affirming 118 Va. 301, 87 S. E. 598.

Under the Virginia statutes the exercise of its corporate functions by any foreign corporation within this State constitutes transacting business here within the meaning of Code, sections 3847 and 3848.

There is nothing unusual about this conclusion, for in *Pacific Typesetting Co.* v. *International Typographical Union*, 125 Wash. 273, 216 Pac. 360, it is said that the activities of the International Typographical Union constituted doing business within the State of Washington, and in this connection the court said: "It can hardly be argued that it was not, for among the important activities of an association such as this is the securing of what its members deem proper hours of labor for them in their trade, and the adoption of satisfactory working conditions and pay. These constitute the major purposes and the principal activities of such organizations. They are created primarily to attain these results, and the effort in any community to secure from their employers the adoption of any or all of these beneficent standards of employment is engaging in the very business for which they continue their existence."

[6] Another claim is made, based upon certain sections of Code, chapter 171, referring to "fraternal beneficiary associations, orders or societies," which are included under Code, title 38, on the general subject of "insurance." Inasmuch as it is perfectly clear that the appellant is not a fraternal beneficiary association and does no insurance business, these sections have no application here, and no elaboration of this is necessary.

[7, 8] We are told that this construction will subject other benevolent societies to similar exactions, though

they have been for years exercising like functions within the State without criticism or molestation. As to this we are not informed, and can only consider the questions which this record presents. Certain it is that these statutes relating to foreign corporations do not affect unincorporated voluntary fraternal organizations. We agree with the Commission, which thus clearly and succinctly expresses its conclusion: "It is apparent that the corporation, through its paid agents, was engaged in the State of Virginia in promoting and carrying out its primary corporate purposes by the establishment of subordinate lodges and the institution therein of its ritualistic forms and ceremonies.

"This constituted 'doing business' within the meaning of the term as above construed and these operations having been carried out in the State by a foreign corporation without compliance with the applicable statutes, it follows that such operations were in violation of law and that the corporation is amenable to the prescribed penalties.

"The conclusion above reached renders it unnecessary to pass upon that portion of the testimony relative to the commercial character of the organization.

"In this proceeding the Knights of the Ku Klux Klan readily afforded the Commission every facility for securing information concerning its operations. It is evident there was no intent on its part to violate the laws of Virginia, and under the circumstances the fine should be nominal."

*Affirmed.*